UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES G. ROWLANDS,

    Plaintiff                                       Civil Action No. 05-72027

v.                                               HON. GEORGE CARAM STEEH
                                                      U.S. District Judge
                                                      HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL            U.S. Magistrate Judge
SECURITY,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff James Rowlands bring this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits (DIB) under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for further proceedings.

## PROCEDURAL HISTORY

On December 12, 2002, Plaintiff filed an application for DIB, alleging an onset of disability of June 15, 2001 (Tr.40-42). After the denial of his claim, Plaintiff filed a timely

request for an administrative hearing, conducted on September 2, 2004 in Oak Park, Michigan before Administrative Law Judge (ALJ) Michael F. Wilenkin. Plaintiff, represented by attorney William Michael White, testified. (Tr. 133-150). Dr. Elaine Tripi, acting as Vocational Expert (VE) also testified (Tr. 150-154). In a decision dated October 21, 2004, ALJ Wilenkin found that Plaintiff was not disabled because although unable to perform his past relevant work as a machine operator or drywall installer, he retained the residual functional capacity to perform a range of sedentary work, found in significant numbers in the national economy (Tr. 14, 19). On March 24, 2005, the Appeals Council denied review (Tr. 3-5). Plaintiff filed for judicial review of the final decision on May 23, 2005.

## BACKGROUND FACTS

Plaintiff, born November 19, 1964, was age 39 when the ALJ issued his decision (Tr. 40). He completed the eighth grade and worked as a drywall hanger and a machine builder and operator (Tr. 63,68). Plaintiff alleges an onset date of June 15, 2001, due to nerve and lower spine damage from an old gunshot wound as well as respiratory problems (Tr. 62).

### A.     Plaintiff's Testimony[1]

Plaintiff testified that he lived in a one-story house with his sister and her husband (Tr.

---

[1] Plaintiff testified that he had resumed work approximately six months before the hearing and was applying for DIB for the period between June 15, 2001 and March 24, 2004 (Tr. 133-134).

134). He stated that he had received an eighth grade education, adding that he had not received any specialized occupational training (Tr. 134). He reported that he had driven himself to the hearing and had resumed working on March 24, 2004, stating that he operated "a little horizontal mill" for a Macomb County company (Tr. 134). He reported that his current position required only minimal lifting (Tr. 135).

Plaintiff alleged disability as of June 15, 2001, stating that he had unsuccessfully attempted to work in July, 2001 but his health problems obliged him to stop working after only six weeks (Tr. 135). He reported that prior to June, 2001, he had performed machine operation, assembly, quality assurance, and hydraulic cylinder testing, indicating further that he had worked as a drywall hanger intermittently (Tr. 136-137). He attributed his inability to work after June, 2001 to asthma, arthritis, and lower back spasms (Tr. 137). He also reported that severe headaches prevented him from holding full time employment (Tr. 138). He indicated that Albuterol prescribed for respiratory problems provided only limited relief (Tr. 138). He acknowledged that at the time he experienced his worst breathing problems he smoked heavily, adding that he quit smoking in June, 2004 (Tr. 139). He stated that since he quit smoking, taking Albuterol had a greater effect on his symptoms of asthma, but that he continued to experience breathing difficulties on "hot, humid" days (Tr. 139).

Plaintiff alleged that back problems obliged him to sleep with a pillow propped up under his back (Tr. 139). He described his back pain as radiating from the middle of his lower back outward, adding that he experienced shooting pains in his right leg (Tr. 141). He reported that his muscle spasms caused discomfort at night, stating that he generally took

muscle relaxers to relieve cramps and pain (Tr. 141). He indicated that he had received a prescription for six weeks of physical therapy while unemployed, but could not find a therapist willing to accept Medicaid (Tr. 142). He added that since resuming work in March, 2004 he now received employee health care coverage and intended to ask his neurologist to rewrite the prescription for physical therapy (Tr. 142). He reported that he attempted to control his back pain and muscle seizures by stretching every day (Tr. 142).

Plaintiff testified that he continued to experience headaches due to sinus problems, a pinched nerve, and venous angina, but stated that his headaches had diminished in severity since receiving a prescription for Inderal on a daily basis in March, 2004 (Tr. 143).

In contrast to his present ability to control the severity and duration of his headaches, he testified that during his the period of alleged disability, he experienced headaches to the extent that he was unable to do anything "but sit down and try and wait for the medicine to take effect" (Tr. 143). He stated that the headaches prevented him from sleeping more than three hours at a time and that his weight plummeted to 132 pounds (Tr. 144). He admitted that while unemployed he continued to groom and feed himself, help his sister with household chores, and grocery shop occasionally (Tr. 144). He stated that during his disability he could stand at maximum for one hour, experienced drowsiness from his muscle relaxers, and experienced pain after sitting for an hour (Tr. 145-146).[2]  He opined that he

---

[2]The Court cannot determine at this point in Plaintiff's testimony whether he was referring to his degree of limitation at the time of the hearing or during the closed period of disability (Tr. 145-146). For example, the ALJ posits "*Did* you have any trouble standing? (Tr. 145), followed by Plaintiff's answer: "To stand in one spot for a length of time *is* worse

was unable to carry a 20-pound weight with any regularity, but could carry 10 pounds on an occasional basis (Tr. 148).

Plaintiff stated that during his unemployment his physical problems which prevented him from sleeping regularly obliged him to take three to four "little catnaps" lasting up to 30 minutes each day (Tr. 148). He reported that during the same period, he used a nebulizer more than six times a day, adding that he still used the nebulizer on a less frequent basis since he quit smoking (Tr. 148-149).

**B.     Medical Evidence**

In April, 2001 G.A. Payton, D.O., noted that Plaintiff reported frequent coughing, sinus congestion, a limited range of motion, (ROM), difficulty breathing and "pain around the orbits" (Tr. 111). He noted that Plaintiff took Tequin, Nasarel nasal spray, Claritin, Tussi 12, Uniphyl 400, Skelaxin, and an Albuteral inhaler (Tr. 111).

In July, 2002 Plaintiff reported to Dr. Payton that he continued to experience difficulty breathing, sinus congestion, and lumbar back pain (Tr. 104). Noting that Plaintiff exhibited evidence of PVM spasms in his lumbar back, Dr. Payton diagnosed lumbar myositis, prescribing Neurotin for back pain (Tr. 104). The next month, he renewed

---

than walking" (Tr. 145). ALJ: "*Were* you able to stoop, or squat, or crouch down or kneel down? (Tr. 146). Plaintiff: "I *can* if I have to . . ." (Tr. 146). Even more confusingly, the ALJ then adopts the same tense as the Plaintiff, querying him as to his present limitations, which as stated in footnote 1, are irrelevant to his claim that he experienced disability between June 15, 2001 and March 24, 2004. Both the ALJ and Plaintiff resumed referring to the closed period of alleged disability beginning with the ALJ's second question on transcript page 148.

Plaintiff's prescriptions, advising him to refrain from smoking (Tr. 103).

In February, 2003, S. Desai M.D., conducted an examination of Plaintiff on behalf of the Social Security Administration (SSA) (Tr. 112-115). He noted that Plaintiff complained of back and spine pain, bronchial asthma, and frequent headaches which he attributed to sinus problems (Tr. 113). Plaintiff reported that he had experienced back pain since receiving a gunshot wound to the abdomen 20 years earlier (Tr. 112). He indicated that he currently took Flexeril, Skelaxin, Ibuprofen, Albuterol, Atrovent, Claritin, and Combivent (Tr. 113). Dr. Desai reported a limited range of movement in the lumbosacral spine and flexion of only 25 degrees, extension 10 degrees, but noted that lateral movement and lateral rotation appeared normal (Tr. 114). He found that Plaintiff experienced asthma of "moderate severity" which he controlled with medication (Tr. 115).

The next month, Robert H. Digby, M.D,. performed Physical Residual Functional Capacity Assessment based on Plaintiff's medical records (Tr. 95-102). He found that Plaintiff retained the ability to lift 20 pounds occasionally and 10 pounds frequently, along with the ability to stand, walk, or sit for six hours in an eight-hour workday along with an unlimited ability to push or pull (Tr. 96). Dr. Digby found further that Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling (Tr. 98). He noted that Plaintiff should avoid concentrated exposure to extreme cold, as well as fumes, odors, dust, gases, and poor ventilation (Tr. 99). In conclusion, Dr. Digby found Plaintiff's allegations "only partially credible," noting discrepancies between Plaintiff's estimation of his limitations as listed in the Activities of Daily Living (ADL) form and the information he

supplied to Dr. Desai (Tr. 100).

In April, 2003 Dr. Payton examined Plaintiff, noting that he still experienced lumbar myositis as well as asthma (Tr. 129). In August, 2003, his notes show that Plaintiff sought treatment for a rash (Tr. 128). Dr. Payton, commenting that Plaintiff's non-compliance with his medication schedule aggravated his condition, also re-advised him to refrain from smoking (Tr. 128). In January, 2004, Dr. Payton recorded that Plaintiff continued to suffer from headaches (Tr. 124).

In February, 2004 an MRI showed results "consistent with a venous angioma/developmental venous anomaly" (Tr. 120). The next month, neurologist Haranath Policherla, M.D., opined that in view of his recent MRI, Plaintiff "needed to be considered for vascular headaches" (Tr. 122). Dr. Policherla prescribed Inderal and advised Plaintiff to keep a headache log (Tr. 122). Later the same month, Plaintiff sought treatment from Dr. Payton for coughing and wheezing (Tr. 123). Dr. Payton noted that Plaintiff was non-compliant with his medication schedule and continued to smoke (Tr. 123).

### C. Vocational Expert Testimony

VE Dr. Elaine Tripi classified Plaintiff's previous work as a drywall hanger as skilled at the heavy exertional level, and his previous work as a machine operator as skilled or semi-skilled at the medium exertional level (Tr. 150). She found that Plaintiff's current work required him to perform semi-skilled work at the light level of exertion (Tr. 150). The VE stated that Plaintiff had acquired skills in his former work, such as "understanding blueprints, using knowledge of hand and power tools, [and] understanding machining concepts" which

were transferable to the sedentary level of exertion, finding that 5,000 of such positions existed in the Detroit metropolitan area (Tr. 150-151). She testified that based on Plaintiff's testimony, his limitations would preclude him from all employment (Tr. 151). The ALJ then asked the VE if any jobs were available to Plaintiff given the following limitations:[3]

> "Assume the existence of a hypothetical person, one whose vocation is situated as the Claimant in terms of age, education, and past relevant work. With respect to such a person please assume that a reasonable interpretation of the credible medical record would allow for a conclusion and support a finding that during the period of time in question the hypothetical individual enjoyed the Residual Functional Capacity to sit six of eight hours of an eight-hour workday, stand or walk two of eight hours of an eight-hour workday, stand or walk two of eight hours of an eight-hours workday. Lift as much as ten pounds occasionally, and lesser weights more frequently. Assume a well-established history of asthma and asthmatic bronchitis. Assume that as a result of this underlying pathology he would occasionally experience significant symptoms of wheezing, coughing, shortness of breath. That but for a failure of compliance according to his physician and continued abuse of smoking tobacco, did not respond to simple broncho-dilator treatment, but would have – -physiologically, that's the case and been demonstrated heretofore, had there been no smoking. In short, you may assume the presence of these symptoms, that under appropriate and not even optimal circumstances would have responded to therapeutic intervention. As such, you may assume that the symptomatology did not not occur with sufficient severity, intensity, or frequency to interfere with or otherwise preclude functioning at the level I suggested. Appears to be a history of complaint of pain and discomfort in the low back and right lower extremity. May assume that this record does not reveal a musculo-skeletal deficit or neurological deficit of sufficient severity or consequence to preclude functioning at the level I suggested. The record reflects a history of complaint of pain and discomfort in the neck, lower back. A history of complaint appears to be, according to his doctor, possibility of

---

[3] The undersigned notes that the hypothetical question above contains sentence fragments and also includes ALJ opinions which appear to stray from the usual format wherein a claimant's occupational limitations are listed. However, given the hypothetical question's significance in the review of the administrative decision, the entire question has been left unedited.

> vascular headaches. You may assume that his record does not reveal the occurrence of symptoms in that regard with that degree of frequency or disruption of function to preclude functioning at the level I described. Clearly, during the period of time inn question would have had to avoided activities requiring twisting or torque-ing the torso or the neck throughout the extremes of range of motion. Activities requiring repetitive and uninterrupted stooping, squatting, kneeling, bending, what have you, would've been inappropriate. Lastly, you may assume that during the period of time in question this record does not reveal the presence of a deficit that have – or any modality employed to treat a deficit that would have necessitated a need to lie down during the course of a typical workday. Now if we were to take those limitations as described, would such an individual have been able to perform any of the work performed by the Claimant during the relevant past? If not, would such a person have been able to perform those other jobs that you have heretofore identified as having been extant during that period?"

(Tr. 151-153).

The VE found that given the above limitations, Plaintiff could not have performed any of his previous jobs between June 15, 2001 and March 24, 2004 (Tr. 153). However, the VE testified that based on the above hypothetical, using occupational skills employed in his previous work, Plaintiff could perform 5,000 jobs found in the local economy at the sedentary level of exertion (see above) (Tr. 153). The VE found further, based on the ALJ's limitations, that Plaintiff could perform unskilled sedentary work as a protective signal operator, gated community monitor, and order taker, testifying that 3,500 such position existed in the local economy (Tr. 154). She also found that Plaintiff could perform "unskilled bench work, which included the jobs of visual inspection, sorter, and hand packer, finding the existence approximately 15,000 of such jobs in the local economy (Tr. 154).

**D.    The ALJ's Decision**

ALJ Wilenkin held that Plaintiff was not disabled from June 15, 2001 to May, 2004 (Tr. 19). Citing Plaintiff's medical records, the ALJ found that Plaintiff had the severe impairments of asthma; low back and neck pain; and headaches, finding nonetheless that Plaintiff's impairments did not meet or equal in severity, any impairment found in Appendix 1, Subpart P, Regulations No. 4 (Tr. 15, 18). He found that Plaintiff retained the following Residual Functional Capacity.

> "[S]it for 6 hours in an 8-hour day, stand, and walk for 2 hours. He is able to lift up to 10 pounds occasionally and less weight frequently. The individual has a history of asthma, and would occasionally experience wheezing, coughing and shortness of breath. But that under appropriate compliance would have responded to therapeutic intervention. The individual's symptoms do not occur with sufficient severity, intensity or frequency (sic) to preclude functioning at the level suggested and has a history of complaints of pain and discomfort in the low back and lower right extremity. The record does not reveal a muscular skeletal deficit, neurological deficit, insufficient severity or consequence to preclude function at the level suggested. He must avoid activities requiring him to twist and torque his torso or neck throughout the extremes of range of motion, or activities requiring repetitive and uninterrupted stooping, squatting, kneeling, and bending"

(Tr. 16).

The ALJ found that while Plaintiff was unable to perform any past relevant work, he retained the RFC for a significant range of sedentary work, reduced by his exertional and non-exertional limitations (Tr. 17). The ALJ found that Plaintiff's skills, including "understanding blueprints, use and knowledge of power and hand tools, and understanding machining concepts, skills generally related to semi skilled jobs such as inspection and quality control," were transferable to approximately 5,000 jobs in the local economy (Tr. 17). In addition, he found that Plaintiff could perform the unskilled, sedentary work of a protective signal operator, gated community monitor, and order taker, testifying that 3,500

of such position existed in the Detroit area, finding further that Plaintiff could perform the jobs of visual inspection, sorter, and hand packer, determining that approximately 15,000 of such jobs existed in the local economy (Tr. 17).

In support of his determination, the ALJ stated that he did not find Plaintiff's allegations of limitations "wholly credible" (Tr. 18). He concluded that "[i]t is . . . clear that he could have stopped smoking in June 2001 thus obviating the need to stop working and/or file the within claim" (Tr. 16).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### SSR 82-59[4]

---

[4]SSR 82-59 states that the "SSA may make a determination that an individual has failed to follow prescribed treatment only where *all* of the following conditions exist

Plaintiff argues that the ALJ erred by equating his failure to follow his physician's advice to quit smoking with non-compliance with prescribed medical treatment. *Plaintiff's Brief* at 2-6.[5] He contends that the ALJ applied the reasoning of SSR 82-59 to find that a claimant's failure to "follow prescribed treatment" can be used as substantial evidence of non-disability *Brief* at 5. He submits that although the administrative opinion did not actually cite to SSR 82-59, his finding that but for his tobacco abuse, he would not be disabled, is premised on the Ruling.

Plaintiff maintains that this constitutes error for two reasons. First, he argues that SSR 82-59's "failure to follow prescribed treatment" does not encompass a physician's advice to quit smoking. Second, he submits that although the ALJ made a *de facto* SSR 82-59 conclusion, he did not apply the four part analysis required by the Ruling.

---

(emphasis added):
1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . .
2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
4. The evidence of record discloses that there has been refusal to follow prescribed treatment. Where SSA makes a determination of 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable."

[5]Plaintiff omits any discussion of Plaintiff's other health problems which standing alone, such as severe headaches (the administrative decision did not even reference Dr. Policherla's treatment); medication side effects causing drowsiness; and residual problems stemming from his gunshot wound to establish disability. Moreover, Plaintiff's brief does not comment on the ALJ's hypothetical question. Any issue not raised directly by Plaintiff is deemed waived, pursuant to *U.S. v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002) *See also Young v. Secretary of Health & Human Services,* 925 Fed. 2d 146 (6th Cir. 1990).

SSR 82-59 provides in pertinent part that after determining that a claimant is impaired, the SSA will deny benefits if "[t]reatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source" *and* "evidence of record discloses that there has been refusal to follow prescribed treatment." 1982 WL 31384, 1 (1982).[6] The Ruling is applied only to "situations where a claimant's condition is actually disabling under the regulations, but the claimant is denied benefits or his benefits are terminated because he refuses to follow treatment that could restore his ability to work." *Wyrick v. Apfel,* 29 F.Supp.2d 693, 698 (M.D.N.C.,1998).

Defendant concedes that Plaintiff's failure to take his doctor's advice to stop smoking is not encompassed in SSR 82-59's reference to a "failure to follow prescribed treatment," but argues that the ALJ's citation of Plaintiff's continued tobacco abuse should be construed as a credibility determination rather than a deficient SSR 82-59 analysis. Admittedly, the ALJ's finding that Plaintiff "could have stopped smoking in June 2001[,] thus obviating the need to stop working and/or file the within claim" is coupled with the observation that Plaintiff's unwillingness to refrain from smoking earlier undermined the general credibility of his allegations. However, read in the context of the entire decision, the ALJ cited Plaintiff's tobacco use to both reject his allegations of limitations *and* demonstrate that

---

[6]*See also* 20 C.F.R. § 404.1530 (b): "If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."

-14-

smoking was the "but for" cause of his disability (Tr. 16).[7] Pursuant to *Sias v. Secretary of Health and Human Services,* 861 F.2d 475, 480 (6th Cir. 1988), the ALJ permissively based his credibility determination on the fact that Plaintiff ignored his physician's advice to give up smoking. However, having *also* determined that smoking and non-compliance with his medication precipitated his need to file a disability claim, he was required to perform a proper analysis of the applicable Ruling. Further, the RFC, which states that Plaintiff's limitations are attributable to his smoking and non-compliance, also alludes to Dr. Payton's repeated observations, independent of his advice to quit smoking, that Plaintiff did not always take prescribed medicine as directed (Tr. 16, 123, 128).[8] SSR 82-59 governs when the "ultimate finding that claimant is not disabled rest[s], in significant part, on [the ALJ's] expressed perception that [the] failure to follow a prescribed treatment caused [a]condition to be worse than it might otherwise be." *Ibarra v. Commissioner of Social Sec.*, *Admin.* 92 F.Supp.2d 1084, 1087 (D.Or.,2000). "Although the ALJ did not make an express finding that claimant would otherwise be disabled, his decision as a whole leaves no doubt that he premised the denial of benefits solely on his belief that claimant's condition could be

---

[7]Likewise, the RFC which supported the conclusion that Plaintiff could perform sedentary work was conditioned on "appropriate compliance [which] would have responded to therapeutic intervention" and is premised on a *de facto* SSR 82-59 conclusion (Tr. 16).

[8]The ALJ's RFC finding that Plaintiff did not take his medication regularly is drawn from his treating physician's reports. Dr. Payton lists "non-compliance" on Plaintiff's charts (apparently referring to his failure to take his medicine regularly), noting *additionally* that he continued to abuse tobacco (Tr. 123).

ameliorated by sobriety and a prescribed treatment regimen." *Id*. at 1088.

Likewise, in the present case, ALJ premised his decision to deny benefits for the closed period pursuant to SSR 82-59, but failed to perform the proper analysis. "Before an ALJ may deny a claim based on the claimant's noncompliance with treatment she must apply the factors listed in SSR 82-59. SSR 82-59 provides that an individual who would otherwise be found to be disabled but who, without justifiable cause, fails to follow prescribed treatment that would restore his ability to work cannot, by virtue of such failure, be found to be disabled." *Lopez-Navarro v. Barnhart,* 207 F.Supp.2d 870, 883 (E.D.Wis.,2002). "The Ruling establishes conditions that must be satisfied before the administration may find that the individual has failed to follow prescribed treatment, and it then requires the administration to determine whether the failure was justifiable." *Id. See also Fleming v. Barnhart,* 284 F.Supp.2d 256, 274 -275 (D.Md.,2003); SSR 82-59 ("before a determination is made, plaintiff will be informed of this fact and of its effect on eligibility for benefits.")

Although Plaintiff acknowledged that his failure to give up tobacco earlier was due to his own poor judgment, the ALJ did not inquire and Plaintiff did not volunteer his reasons for non-compliance with medication prescribed by Dr. Payton. Although the ALJ failed to inquire into Plaintiff's reasons for non-compliance, he in fact attributed his need to stop working to non-compliance, along with his continued tobacco use. Having conducted a determination governed by SSR 82-59, he committed reversible error failing to adhere to its procedures.

While standing alone, the ALJ's misapplication of SSR 82-59 mandates remand, I

note in closing that the administrative record contains additional errors which lead me to question the vitality of the entire decision. Although Plaintiff applied for a closed period of disability, the decision presents all of Plaintiff's occupational limitations and health conditions in the present tense. Similarly, as discussed in footnote 2, the ALJ's examination of Plaintiff drifted between his present limitations and those he experienced while unemployed. I note further that although the ALJ attributes the cessation of disability to the fact Plaintiff quit smoking, in fact, he returned to work within a month of receiving new headache medication and did not quit smoking until several weeks after returning to work. However, the errors in the administrative decision, while critical, do not suggest that Plaintiff is automatically entitled to benefits. Thus, I find that pursuant to *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) this case should be remanded for further proceedings consistent with this Report and Recommendation.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED and that the case be remanded for further proceedings.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 30, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or

parties of record by electronic means or U.S. Mail on March 30, 2006.

                                                S/Gina Wilson
                                                Judicial Assistant